UNITED STATES EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

Plaintiff,

-vs-                                                    Case No.  6:07-cv-1496-Orl-19GJK

DILLARD'S, INC.,

Defendant.
_____

# ORDER

This matter comes before the Court on the following:

1.      Motion by Dillard's, Inc. for Summary Judgment (Doc. No. 50, filed Oct. 3, 2008);

2.      Memorandum by Dillard's, Inc. in Support of Motion for Summary Judgment (Doc. No. 68,

filed Feb. 26, 2009);

3.      Memorandum by the United States Equal Employment Opportunity Commission ("EEOC")

in Opposition to Motion for Summary Judgment (Doc. No. 53, filed Nov. 3, 2008);

4.      Notice by the EEOC of Filing Exhibits in Opposition to the Motion for Summary Judgment

(Doc. No. 54, filed Nov. 3, 2008); and

5.      Notice by the EEOC of Filing Exhibits in Opposition to the Motion for Summary Judgment

(Doc. No. 69, filed Feb. 27, 2009).[1]

---

[1]   The Memorandum by Dillard's Inc. in Support of Motion for Summary Judgment, Inc.,
(Doc. No. 51, filed Oct. 3, 2008), and the Notice by the EEOC of Filing Exhibits in Opposition to
the Motion for Summary Judgment, (Doc. No. 55, filed Nov. 3, 2008), were both stricken due to
instances of un-redacted social security numbers.  (Doc. No. 67, filed Feb. 25, 2009.)  The second
and fifth documents listed above are the refiled versions of these docket entries.

**Background**

  The EEOC filed this employment discrimination action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 (2006), against Dillard's, Inc. based on allegations of sexual harassment lodged by two former Dillard's employees, Paul Reed and Scott Giacomin.[2] (Doc. No. 1, filed Sept. 19, 2007; Doc. No. 53.) Dillard's now moves for summary judgment. (Doc. No. 50.)

  Dillard's operates a retail store in Orlando, Florida that sells apparel, home furnishings, and related accessories.[3] (*E.g.*, Doc. No. 69-7 at 1.) Paul Reed, a thirty-seven-year-old man, worked at this store from January 4, 2005 through June 24, 2005. (Reed. Dep. at 13, 32.)[4] According to Reed's deposition testimony, Reed worked a midnight shift to assist with inventory approximately two weeks after he started working at Dillard's. (*Id.* at 180.) Reed was placed under the supervision of James Hines, an assistant manager who normally served as the "Area Sales Manager" for women's apparel. (*Id.*) At some point during the night, Hines approached Reed and told him to help Hines in the back stockroom. (*Id.* at 182.) Reed complied and followed Hines downstairs to a large, dimly lit room. (*Id.*) Reed walked through the room and soon realized that he could not see Hines. (*Id.*) Eventually, Reed turned and found Hines standing "pretty close up on" him. (*Id.* at 183.)

---

[2] The EEOC is authorized under 42 U.S.C. § 2000e-5(f)(1), (3) to bring civil actions to enforce Title VII. Neither Reed nor Giacomin has sought to intervene in the matter.

[3] These facts are being recited for contextual purposes and are set forth in the light most favorable to the plaintiff.

[4] Both parties have provided copies of Reed's deposition as exhibits. Dillard's filed an abridged version, while the EEOC filed the full version in two separate documents. (Doc. Nos. 54-6 to -7; Doc. No. 68-3.) For the sake of clarity, the Court will cite to the deposition as "Reed Dep." To avoid citing three different documents, the Court will refer to the page number of the original transcript rather than the page numbers that CM/ECF has assigned to the various submitted exhibits.

Reed then noticed that Hines had taken his penis out through his zipper and was masturbating in front of Reed. (*Id.* at 183, 187.) Shocked, Reed backed up and asked Hines, "What are you doing?" (*Id.* at 183, 185.) Hines replied, "Oh come on. You know you want it." (*Id.* at 183.) Reed responded, "No I don't" and started to quickly leave the room. (*Id.* at 183, 185-86.) As Reed left, he saw Hines ejaculate on the floor. (*Id.* at 183, 188.) Reed left the room, went upstairs, and told another employee what happened. (*Id.* at 186.) Reed stated during a deposition that he was "really shaken up" over the incident.[5] (*Id.*)

Reed's store manager was Gerald Coffey. (*Id.* at 106.) Reed immediately told Coffey about the incident, explaining that Hines masturbated in front of Reed after taking Reed to a room under the pretense of moving stock. (*Id.* at 205-06.) Reed told Coffey that he was alarmed, horrified, appalled, and shaken up over the incident. (*Id.* at 206.) Coffey replied that he did not want anything to interfere with inventory, and he told Reed, sternly, that:

> I want you to understand one thing. I need you to get back on the floor and do your job. . . . You have been here two weeks and James [Hines] has been here for 14 years and . . . as far as I'm concerned, I think you are just trying to cause trouble at this point, so get back to your inventory and let's get this done . . . .

(*Id.*) Coffey then told Reed that Coffey would deal with the problem, and Reed did not complain again because he thought Coffey would do as he said. (*Id.* at 210-11.) Coffey apparently did not report this incident to the district office. (Doc. No. 68-18 at 1-2.) During his deposition, Coffey denied that this exchange took place and testified that he never met Reed. (Doc. No. 69-5 at 2, 8-9.)

Several months later, in April of 2005, Reed was feeling ill and asked a fellow employee

---

[5]    Reed theorized that Hines may have masturbated in front of him because Hines knew that Reed was homosexual and might have thought that Reed would not be offended. (*Id.* at 184-85.) However, Reed emphasized during his deposition that he was offended, and Hines did not know him well enough to make this judgment. (*Id.* at 183-85.)

whether she had any heartburn medication. (Reed. Dep. at 189.) Hines then approached Reed and told him that Hines had some medication in his office. (*Id.*) Reed thought other people would be in Hines' office because he had heard that Hines was having a small bridal shower or some other type of party in his office that day. (*Id.* at 189-90.) However, upon entering, Reed realized no one else was there. (*Id.*) Hines began to rifle through his desk to give the impression that he was looking for medicine. (*Id.* at 190.) He then got up and went to the door where Reed was standing. (*Id.* at 193.) Reed expected Hines to hand him medicine, but instead Hines pressed himself against Reed and said, "You know you want it. Why don't you just give it to me. You know you just want it." (*Id.* at 190.) At this point, Hines was close enough that Reed could feel Hines' breath on his face. (*Id.* at 193-94.) Hines then put his hands on Reed's forearms, and Reed could feel Hines' lower torso and legs pressing against him. (*Id.* at 194-95.) Reed replied, "No, I don't." (*Id.* at 190, 196.) Reed then broke away and went back to his work area. (*Id.* at 190, 193-94.)

Reed then went to Coffey and told him about the incident in Hines' office. (*Id.* at 212.) As before, Coffey responded that Hines had been with Dillard's for fourteen years. (*Id.* at 213.) Coffey told Reed, "You are one of the new guys here and I just think you are out looking for trouble. I think you're overreacting. I think you're hypersensitive . . . ." (*Id.*) Coffey explained to Reed that the incident seemed innocent and that Reed should focus on his work. (*Id.*) Reed told Coffey that he was insulted by the reaction and felt that his concerns were being dismissed. (*Id.*) Coffey replied that he would talk to Hines. (*Id.*) Again, Coffey denies that this conversation took place. (Doc. No. 69-5 at 2, 8-9.)

The final incident involving Reed occurred on June 23, 2005. Near the end of his shift that day, Reed was using a urinal in the bathroom at Dillard's and heard noises coming from the stalls

behind him. (Reed Dep. at 197.) Seconds later, Hines came up behind Reed and "covered [him] like a cape." (*Id.* at 199-200.) Reed initially felt Hines' neck, chest, torso, and groin behind him; he then felt Hines reach around and put his hand on Reed's penis, all while Reed was still urinating. (*Id.*) Hines began turning Reed around while Hines' hand was still on Reed's penis. (*Id.* at 198.) Reed then shoved Hines away. (*Id.* at 198-200.) As Reed turned, he recognized Hines and shouted at Hines to leave him alone. (*Id.*) Reed thought to himself: "That is it. I am done. I have had enough of this, and I am out of here." (*Id.* at 198.) Reed left the bathroom, clocked out, and never returned to Dillard's.[6] (*Id.*)

Approximately one month earlier, Dillard's hired Scott Giacomin. (*Id.* at 171.) At the time, Giacomin was nineteen years old and an undergraduate student at the University of Central Florida. (Giacomin Dep. at 21.)[7] Giacomin worked for Dillard's as a dock worker from May 24, 2005 to August 5, 2005. (*Id.* at 42, 73-74.) Giacomin does not recall who was his direct supervisor, but he remembers that Coffey was the top manager at the store and that Hines was the manager in charge when Coffey was absent. (*Id.* at 74-76, 98.)

Sometime around June 27, 2005, several days after the final incident with Reed, Giacomin and Hines spoke about "movies." (*Id.* at 90-91.) Later that day, Hines approached Giacomin and asked him if Giacomin had seen one of several movies in which Hines had appeared. (Doc. No. 68-

---

[6]     Hines also told Reed during Reed's first week of employment that Reed was a "handsome man." (Reed Dep. at 209.) Occasionally, when Hines saw Reed, Hines would say "Oh, here comes my bitch," or when Reed was with another male employee, "Here comes my bitches." (*Id.*)

[7]     Similar to Reed's deposition, Dillard's filed an abridged version of Giacomin's deposition, and the EEOC filed the entire transcript in two exhibits. (Doc. No. 54-6 to -7; Doc. No. 68-3.) Again, the Court will cite to Giacomin's deposition as "Giacomin Dep." Citations to page numbers will reference the pagination in the original transcript.

5 at 1.)[8]  Hines later explained to Giacomin that Hines was bisexual and that "movies," apparently of the pornographic sort, were a good way to make money in California where Hines previously had lived.  (*See id.*)  Hines offered to bring one of the movies to show Giacomin.  (*Id.* at 1-2.)

Later Giacomin went to the break room to take a break.  (*Id.* at 2.)  Hines walked in and noticed that Giacomin was there.  (*Id.*)  He told Giacomin that there was another place to take a break where people would not be able to find him.  (*Id.*)  Giacomin followed Hines to another, "utility-type" room behind the break room.  (*Id.*)  Hines then showed Giacomin the corner and told him, "I love to wack it here every morning.  I love to wack it.  Sometimes people come here with me.  They watch me do it.  I had people suck me off, and I've fucked up here."  (*Id.*)

At this point, Hines was standing approximately six feet in front of Giacomin.  (Giacomin Dep. at 95.)  Hines asked Giacomin whether he was straight, bisexual, or open minded, and Giacomin answered that he was straight.  (Doc. No. 68-5 at 1-2.)  Hines then told Giacomin, "Even boys have wacked it together before."  (*Id.*)  Hines asked Giacomin whether he agreed that it was alright to watch and not let anyone touch.  (*Id.*)  Giacomin responded, "yes," but Hines did not ask what this meant, and Giacomin stated during his deposition that he did not mean to give permission for Hines to begin masturbating.  (Doc. No. 68-5 at 2-3; Giacomin Dep. at 100.)   Seconds later, Hines said, "Well I'm going to wack it now."  (Doc. No. 68-5 at 3.)  Hines then pulled down the front of his pants, reached into his pants, and pulled out his penis.  (*Id.*; Giacomin Dep. at 95-96.)  Giacomin told him to stop, but Hines responded that he thought Giacomin was "ok" with it.  (Doc.

---

[8]      Coffey instructed Giacomin to draft a written synopsis of Hines' alleged harassment.  Both parties cite to the document as a summary of the events that occurred, (Doc. No. 51 at 5-6; Doc. No. 53 at 6-7), and neither appears to object to the document as hearsay.  Absent such objection, the Court will consider this document for summary judgment purposes but expresses no opinion as to its admissibility at trial.

No. 68-5 at 3.)  Giacomin replied "no," said that it made him uncomfortable, and told Hines that he had to leave the room.  (*Id.*)

Giacomin immediately reported the incident to Coffey.  (Giacomin Dep. at 83-85.)  Coffey recounted in a memorandum that Giacomin was visibly upset during this conversation.  (Doc. No. 69-6 at 1.)  Coffey instructed Giacomin to draft a written complaint, and Giacomin complied. (*Id.*) Coffey then faxed the complaint to William Appleby, the "District Manager."  (Doc. No. 69-5.)  The district office later called Coffey and instructed him to fire Hines.  (*Id.* at 82-83.)

Hines' termination form states that Hines was fired for violating company policies.  (Doc. No. 69-4.)  His disciplinary action form, made contemporaneously with his termination, indicates that the Giacomin incident was one of two reported instances of sexual harassment.  (Doc. No. 69-3.)  The earlier report involved an employee, Arturo Sanabria.  (Doc. No. 68-18 at 1-2.)  Hines allegedly propositioned Sanabria for sex and retaliated against Sanabria for refusing his advances. (Doc. No. 55-2; Doc. No. 69-16.)  Sanabria ultimately filed a lawsuit in this Court, and Dillard's later resolved the claim before it went to arbitration.  (*See id.*)  Despite the apparent settlement, however, Dillard's contends that it never "substantiat[ed]" Sanabria's claim, and there is no evidence in the record that Dillard's conducted an investigation or took action against Hines.  (Doc. No. 68-18 at 2.)  In fact, Coffey promoted Hines, with Appleby's permission, sometime after Sanabria complained.  (Doc. No. 69-5 at 13.)  Appleby told Coffey that Hines had been the subject of a previous problem at the store, but he did not specify that it had been a sexual harassment complaint.  (*Id.* at 15.)

Following the utility room incident, Giacomin worked for Dillard's until August 5, 2005, but he never saw Hines again.  (Giacomin Dep. at 42, 120-21.)  On his separation documentation,

Giacomin indicated that his reason for leaving was "due to school." (*Id.* 121-23.) However, Giacomin testified during his deposition that he quit because he felt uncomfortable after the incident. (*Id.* at 115-16.)

According to the Dillard's harassment policy, employees such as Reed and Giacomin are "urged to report the harassment to <u>any one of the following persons, at your discretion</u>: a. A member of executive management at your location; b. Your store's District Manager, if applicable; or c. The Office of the General Counsel in Little Rock by placing a collect call to 501-376-5365." (Doc. No. 54-5 at 6 (emphasis and capitalization as in original; formatting altered).) The policy explains that any supervisor who receives a report must immediately inform his or her supervisor at the next higher level, or the next higher level of management above the harasser, without making any judgment as to the validity of the report. (*Id.*) The policy also declares that "[e]ach complaint shall be investigated and a determination of the facts will be made on a case-by-case basis." (*Id.*) In addition, while not referencing harassment, the Dillard's "open door" policy encourages employees to approach their supervisors with "issues of concern" and "contact the next level of [m]anagement" if "this is not satisfactory." (Doc. No. 54-5 at 5.) Employees are required to read this policy upon being hired, and they are also required to watch orientation videos covering the topic of sexual harassment. (Reed Dep. at 108-09; Giacomin Dep. at 62, 68.) Dillard's does not appear to provide any other formal, continuing, or periodic sexual harassment training to its personnel.

**Standard of Review**

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004). An issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case. *Hickson Corp.*, 357 F.3d at 1259. An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.* at 1260. A court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.*; *Anderson*, 477 U.S. at 251-52.

The party moving for summary judgment has the burden of proving that: (1) there is no genuine issue as to any material fact, and (2) it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The court may not weigh conflicting evidence or weigh the credibility of the parties. *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993). If a reasonable fact finder could draw more than one inference from the facts and that inference creates an issue of material fact, a court must not grant summary judgment. *Id.* On the other hand, summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

**Analysis**

The EEOC makes two related claims in this case: (1) that Reed and Giacomin suffered a hostile work environment; and (2) that Reed and Giacomin were constructively discharged by virtue of the hostile work environment. (Doc. No. 51 at 11-13.) Dillard's contends that both claims should be dismissed. (*Id.*) According to Dillard's, Hines' alleged conduct was insufficient to constitute a hostile work environment and, in any event, the corrective action Dillard's took is sufficient to relieve it of liability. (*Id.* at 13-18, 19-24.) Regarding the constructive discharge claim, Dillard's argues that Hines' conduct was not serious enough to compel a reasonable employee to resign; moreover, both Reed and Giacomin left for reasons unrelated to Hines' alleged harassment. (*Id.* at 18-19.) Dillard's also contends that the EEOC is not entitled to punitive damages. (*Id.* at 25.)

**I.      Hostile Work Environment**

Title VII of the Civil Rights Act of 1964 states in relevant part that it shall be an unlawful employment practice for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). As the United States Supreme Court explained, "The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation and quotation marks omitted).

Under the current case law, proof of a hostile environment sexual harassment claims requires the plaintiff to establish the following: (1) that he belongs to a protected group; (2) that he was

subject to unwelcome sexual harassment; (3) that the harassment was based on his sex; (4) that the harassment was "sufficiently severe or pervasive to alter the terms and conditions of his employment and create a discriminatorily abusive working environment"; and (5) that a basis exists for holding the employer liable. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc). Dillard's contends that the fourth and fifth elements are not satisfied.

## A.  Whether the Harassment was Sufficiently Severe or Pervasive

As explained in *Mendoza*, "[s]exual harassment constitutes sex discrimination only when the harassment alters the terms or conditions of employment." *Id.*  Title VII should not be treated as a federal civility code, and "an employer's harassing actions toward an employee do not constitute employment discrimination under Title VII unless the conduct is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (citation, quotation marks, and brackets omitted).  This determination involves both a subjective and an objective component:

> The employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable.  The environment must be one that a reasonable person would find hostile or abusive and that the victim subjectively perceives to be abusive.  Furthermore, the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.

*Id.* at 1246 (citations, quotation marks, brackets, and ellipses omitted).  In this case, Dillard's appears to challenge only the objective component of the test.

The objective component of this analysis is fact-intensive and requires consideration of four factors from the perspective of a reasonable person in the employee's position:

> (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and

(4) whether the conduct unreasonably interferes with the employee's job performance.

*Id.* (citing *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997)). A court should consider the conduct in context, rather than as separate and isolated acts. *Id.* Ultimately, the court must determine "under the totality of the circumstances" whether the harassing conduct is "sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment." *Id.* (citing *Allen*, 121 F.3d at 647). The alleged conduct need not satisfy all four factors of the test if this overall standard is met. *Reeves v. C.H. Robinson Worldwide, Inc.*, 525 F.3d 1139, 1145-46 (11th Cir. 2008) (finding that a harasser's conduct was not severe or physically threatening, in light of the relevant case law, but a genuine issue of material fact existed based on the other factors being satisfied).

Although the Eleventh Circuit has articulated a uniform test for courts to apply in hostile work environment cases, the line between actionable conduct and non-actionable conduct is not always clear in practice. The line has been particularly elusive when the courts have been called upon to determine whether frequent, but not exceptionally egregious, conduct is sufficiently pervasive or severe to become actionable. *Compare Reeves*, 525 F.3d at 1145-46 (concluding that the daily use of sexually explicit language at work by male co-workers was sufficiently pervasive and humiliating that it created a genuine issue of material fact whether a hostile work environment existed, even though the conduct was not "severe" relative to the conduct found in other cases and did not involve any physically threatening behavior); *Husley v. Pride Rests., LLC*, 367 F.3d 1238, 1248 (11th Cir. 2004) (concluding that the district court erred in granting summary judgment to employer where offending supervisor repeatedly over a two-week period attempted to touch the plaintiff-employee's breasts, place his hands down her pants, and pull off her pants; he directly and

indirectly propositioned the employee for sex, followed her into the restroom, and enlisted the assistance of others to hold the employee while he attempted to grope her); *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276-77 (11th Cir. 2002) (holding that a reasonable jury could find an ethnically hostile work environment where an employee was the victim of ethnic slurs three to four times a day, was frequently subjected to intimidating shouting and derogatory comments in public, was required to interact with the main harasser on a daily basis, and was unable to perform his job on at least one occasion because of this conduct); *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (reversing summary judgment for the employer in a sexually hostile work environment case where the employee alleged roughly fifteen separate instances of harassment over the course of four months, during which time her radio talk show co-host gave her unwanted massages, stood close behind her such that "his body parts touched her," and pulled his pants tight "to reveal the imprint of his private parts"); *with Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 578-79, 584-86 (11th Cir. 2000) (overturning jury's verdict in favor of the employee on a sexual harassment claim when the employee alleged that another employee called her at home two to three times a week but did not make sexually explicit remarks or innuendos, stared at her legs, put his hand on her thigh, lifted the hem of her dress, unzipped his pants and tucked his shirt into his pants in front of her, and complemented her appearance), *abrogated on other grounds as recognized in Crawford v. Carroll*, 529 F.3d 961, 973-74 (11th Cir. 2008); *Mendoza*, 195 F.3d at 1242-43, 1247-53 (affirming summary judgment for the employer where the employee alleged that her supervisor constantly stared at employee, followed her around, looked her up and down, made sniffing motions while looking at her groin area on two separate occasions, and rubbed his right hip against her left hip); *Mitchell v. Pope*, No. 05-14927, 189 F. App'x 911, 913-14 & n.3

(11th Cir. July 14, 2006) (unpublished) (affirming summary judgment to employer where the employee alleged her supervisor engaged in offensive conduct approximately sixteen times over the course of four years, made overtly sexual statements, tried to kiss her, lifted her over his head, rubbed against her, reached across her chest, appeared at her house, followed her into the bathroom and turned off the lights, and simulated "humping" another female).

In this case, however, the severe conduct experienced by Reed and Giacomin falls squarely within the actionable category. Dillard's argues that both employees experienced isolated and brief episodes of harassing conduct: Reed was subject to three brief incidents, and Giacomin once was unwillingly forced to witness Hines masturbate for a few seconds. (Doc. No. 51 at 13-18.) Thus, Dillard's contends, this case does not involve the relentless, pervasive conduct found in cases where a hostile work environment has been recognized. (*Id.*) The flaw in this reasoning is that relentless harassment is not required if the few, isolated incidents that occurred were sufficiently severe, humiliating, or physically threatening to otherwise satisfy the "totality of the circumstances" test. *Reeves*, 525 F.3d at 1146. In this case, a reasonable jury could find that they were.

As explained above, Reed was subject to three incidents: (1) he observed Hines masturbate; (2) Hines held Reed and proposition him for sex; and (3) Hines accosted Reed and grabbed Reed's penis while Reed was urinating in a Dillard's bathroom.[9] The severity of these incidents,

---

[9] Hines also referred to Reed as his "bitch" on several occasions. (Doc. No. 51 at 15.) Dillard's contends that "there is no evidence that these . . . utterances were related to Reed's sex. . . . Rather, in this context, it appears that the names were related to Reed's sexual orientation . . . ." (*Id.*) Therefore, Dillard's contends, the utterances should not play into the Title VII analysis. (*Id.* (citing *Cox v. Denny's, Inc.*, No. 98-1085-CIV-J-16B, 1999 WL 1317785, at *3 (M.D. Fla. Dec. 22, 1999)).) Dillard's is correct to the extent that comments solely directed toward Reed's homosexuality could not be taken as commentary on his sex. *See Cox*, 1999 WL 1317785, at *1, 3 (concluding that an implicit proposition for sex was based on the plaintiff's gender, while
(continued...)

particularly the first and third, is extreme.  During the first, Reed unwillingly observed Hines masturbate and ejaculate on the stockroom floor.  During the third, Reed was the victim of a sexual battery.  The fact that these incidents lasted mere seconds is not surprising; one would not expect Reed or any reasonable employee to tolerate such conduct for any longer.  Thus, assuming that Reed's testimony is true, there is little question that Reed experienced at least two severe incidents, one of which was physically threatening, and both of which were humiliating.  In addition, it is reasonable to presume that the conduct Reed experienced would  interfere with an employee's ability to perform his job: it should require little explanation that an employee cannot effectively work if he is afraid of being sexually battered in the bathroom.

The closer question is whether Giacomin's one incident of harassment satisfies the "severe or pervasive" standard.  The facts of this case are novel: the parties have not presented, nor has the Court found, any case analyzing whether one incident of a supervisor exposing his genitals and masturbating constitutes "severe or pervasive" harassment.  However, the Court is not without some guidance.  The Supreme Court has theorized that isolated but sufficiently severe incidents of harassment can satisfy the "severe or pervasive" standard.  *Faragher*, 524 U.S. at 788 (concluding that isolated incidents satisfy the threshold for actionable conduct if "extremely serious"); *see also Reeves*, 525 F.3d at 1146 n.4 (noting that the Eleventh Circuit has joined other circuits in

---

[9](...continued)
comments such as "fag" and "freak mother fucker" were directed to the plaintiff's sexual orientation and transsexual status).  But the Court cannot attribute Hines' comments solely to Reed's sexual orientation, a classification not protected by Title VII, because the comments also appear to have been directed to the fact that Reed was a *male* homosexual and a target of Hines' sexual advances.  Absent evidence that Hines referred to all homosexuals, male and female, as his "bitches," the Court will not assume that these comments were unrelated Reed's sex.  In any event,  the conduct Reed experienced easily clears the summary judgment threshold even without these comments included.

recognizing that conduct may be either severe or pervasive and need not be both (citing *E.E.O.C. v. WC&M Enters., Inc.*, 496 F.3d 393, 400 (5th Cir. 2007); *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003); *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002))).  Further, several federal appellate courts have held that one incident of an assault or battery is sufficient to satisfy this standard.  *Smith v. Sheahan*, 189 F.3d 529, 534 (7th Cir. 1999) ("A jury would also be entitled to conclude that the assault Smith suffered was severe enough to alter the terms of her employment even though it was a single incident.");  *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir. 1995) (finding that a single incident of sexual assault creates an abusive work environment for purposes of Title VII), *abrogation on other grounds recognized in Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999).  The closest case is *Longstreet v. Ill. Dep't of Corr.*, No. 99 C 2490, 1999 WL 965715, at *1-2 (N.D. Ill. Sept. 29, 1999).  There, a federal district court found that a corrections officer stated a claim under Title VII where she alleged that (1) a fellow officer shouted obscenities at her; (2) the officer then masturbated in front of her and forced her to clean up after him; and (3) another officer rubbed his crotch against her rear end about one month later.  *Id.* at *1.  Citing *Faragher*, the court held that these isolated incidents were sufficiently severe to be actionable under Title VII.[10]  *Id.* at *1-2.

_____

[10]        Other cases have involved masturbation but are factually different in several respects. In *Garret v. Dep't of Corr.*, 589 F. Supp. 2d 1289, 1292-94 (M.D. Fla. 2007), a female nurse working in a correctional facility experienced multiple instances of male inmates masturbating "at her" and yelling obscenities.  The court found that this conduct could establish a hostile work environment based on the correctional facility's failure to prepare the nurse for this conduct and take steps to control the inmates.  *Id.* at 1299; *see also Freitag v. Ayers*, 468 F.3d 528, 540 (9th Cir. 2006) (finding that a female correctional officer experienced a hostile work environment where she witnessed "inmates masturbating in an exhibitionist manner, oftentimes while they directed verbal taunts and crude remarks at her").  In *Vernarsky v. Covenant Transp., Inc.*, No. 1:01-CV-305, 2003 WL 21212776, at *2 (E.D. Tenn. Apr. 15, 2003), a trucking supervisor was alleged to have

(continued...)

Despite the lack of legal authority directly on point, the Court is satisfied that Hines' alleged conduct toward Giacomin is what the Supreme Court had in mind as an "extremely serious" isolated incident. According to Giacomin's testimony, Hines led Giacomin into the utility room under the pretense of showing Giacomin an alternative break location. (Giacomin Dep. at 95-96.) Hines then masturbated with the apparent hope that Giacomin would watch. (*Id.*) Hines apparently orchestrated the entire incident for his own sexual gratification. This is not a case of innocuous locker-room behavior between friends. Hines' alleged behavior constituted a sexual crime under Florida law. Fla. Stat. § 800.03 (2008) (criminalizing the exposure of one's sexual organs "in a vulgar or indecent manner" in public or on the private premises of another); *State v. Cromartie*, No. 4D05-1568, 2006 WL 2771869, at *1 (Fla. 4th DCA Sept. 27, 2006) (upholding a conviction under section 800.03 where a jail inmate masturbated in his jail cell). Thus, though Hines' behavior was not frequent, it can be fairly characterized as "severe."

In addition, the incident satisfies the remaining factors which courts are directed to consider in determining whether conduct is actionable. The conduct Giacomin witnessed was "humiliating" within the normal meaning of the word. *Reeves*, 525 F.3d at 1146-47 (reasoning that exposure to pornographic images on a coworker's computer was humiliating). Further, there is evidence that the conduct caused "unreasonable interference" with Giacomin's job performance. This determination asks the Court to evaluate whether Giacomin's reaction to the harassment was

---

[10](...continued)

masturbated in the bottom bunk while the female plaintiffs were in the same truck. The court found that this behavior, coupled with a number of sexual comments, was sufficient to raise a genuine issue of material fact. *Id.* at *6. However, it does not appear that the supervisor masturbated in front of the plaintiffs or in an exhibitionist manner. *Id.* at *2, 6.

reasonable in light of the circumstances. *See Harris*, 510 U.S. at 22; *Reeves*, 525 F.3d at 1146. According to the record, Giacomin was nineteen years old at the time, and he recognized Hines as the second manager in charge after Coffey. Giacomin testified that he feared retaliation from Hines' friends after the incident, and he also became uncomfortable and "paranoid" during the rest of his employment at Dillard's. (Giacomin Dep. at 115-17.) Giacomin's claimed discomfort would be reasonable for a limited period following the incident he witnessed, given the severity of the conduct he experienced. *Reeves*, 525 F.3d at 1147 (finding that conduct unreasonably interfered with an employee's work performance where she had difficulty concentrating, began to shake when she remembered a pornographic image she had witnessed, and had to take time away from work to report the conduct to her supervisors); *see also Harris*, 510 U.S. at 22 (explaining that a plaintiff need not suffer a clinically recognized psychological injury so long as an environment is reasonably perceived as hostile or abusive, though conduct which would cause psychological trauma to a reasonable person is certainly barred by Title VII). On the other hand, evidence in the record suggests that the effect on Giacomin was mitigated by Dillard's prompt termination of Hines. In fact, Giacomin worked for another month without further incident. Thus, this factor does not weigh as strongly in the EEOC's favor as the "severity" or "humiliation" factors, but it nevertheless supports the EEOC's case. On the whole, a reasonable juror could find that the harassment was sufficient to alter the terms and conditions of Giacomin's employment at the time the harassment occurred..

As a final matter, although Dillard's does not state so explicitly, several passing comments in its Motion appear to be directed to the issue of whether Reed and Giacomin subjectively believed that Hines' conduct was sufficiently severe or pervasive to alter the terms or conditions of their

employment. For instance, Dillard's emphasizes that Giacomin voluntarily conversed with Hines and voluntarily followed him to the utility room. (Doc. No. 51 at 13.) Likewise, Dillard's notes that Reed attended a party at Hines' house in May of 2005, after the first two incidents but before the third. (*Id.* at 23.) Even if these passing comments were enough to raise the issue of whether Reed and Giacomin satisfy the subjective component of a hostile work environment claim, there is ample evidence in the record that both employees subjectively believed that Hines' behavior altered the terms and conditions of their employment. As explained above, Reed complained to Coffey after the first two incidents and quit after the third. Likewise, Giacomin immediately complained to Coffey after the utility room incident. Coffey recalls Giacomin being visibly upset and trembling. Both employees claim that they are still upset by the incidents. Thus, a reasonable jury could find that Reed and Giacomin meet this subjective requirement.

### B. Whether a Basis Exists for Holding Dillard's Liable

Dillard's next argues that even if a hostile work environment existed, the company can avail itself of the affirmative defense established by the Supreme Court in *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). In that case, the Supreme Court stated, "When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence." *Faragher*, 524 U.S. at 807. To demonstrate the applicability of this affirmative defense, the employer must establish two necessary elements:

> (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior,[11] and (b) that the plaintiff employee unreasonably failed

---

[11] There are two components to this element: first, the duty to prevent harassment, and second, the duty to correct and prevent further recurrences of the harassing behavior. *See Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1369 (11th Cir. 1999) (Barkett, J., concurring) ("A court's

(continued...)

to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Id.*

With regard to the first element of the *Faragher* affirmative defense, the Eleventh Circuit has stated that "the Supreme Court implied that employers could meet the initial burden in determining whether they had exercised reasonable care to prevent sexual harassment by promulgating an anti-harassment policy." *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1297-98 (11th Cir. 2000) (citing *Faragher*, 524 U.S. at 807). When reviewing the reasonableness of an employer's anti-harassment policy, courts should consider the employer's "size, location, geographic scope, organizational structure, and industry segment" to determine "whether the complaint procedures . . . adequately fulfill Title VII's deterrent purpose." *Id.* at 1298. An effective policy should encourage victims of harassment to come forward without requiring the victim to complain first to the offending supervisor. *Id.* (quoting *Faragher*, 524 U.S. at 806). Further, even where the policy meets this effectiveness standard, it must also be implemented properly. *Madray*, 208 F.3d at 1299. Thus, the Eleventh Circuit has explained that an employer may not rely on a policy that was implemented in "bad faith." *Id.*; *Freytes-Torres v. City of Sanford*, 270 F. App'x 885, 891-92 (11th Cir. 2008) (concluding that a policy was administered in bad faith where the investigation was conducted by someone directly supervised by the harasser and no corrective action

---

[11](...continued)
assessment as to whether a defendant has proved this defense requires, first, an analysis of whether the employer has exercised reasonable care in *preventing* sexual harassing behavior. The court next directs its inquiry to whether the employee made reasonably sufficient use of available avenues to put the employer on notice of the problem. Finally, the court refocuses on the employer to determine whether the employer or its authorized agent, after receiving notice of the harassment, took adequate steps to abate it and prevent its recurrence." (emphasis in original)).

was taken); *Mack v. St. Mobile Aerospace Eng'g*, 195 F. App'x 829, 840 (11th Cir. 2006) (concluding that a policy was dysfunctional where the plaintiff's manager failed to report incidents of harassment, and evidence existed that other managers, on at least five occasions, did not report sexual harassment complaints); *see also Dees v. Johnson World Servs. Inc.*, 168 F.3d 417, 423 (11th Cir. 1999) ("A jury could reasonably infer from each of these allegations that World Services knew before Dees filed her complaint in August 1994 that Fire Department supervisors were sexually harassing employees, yet failed to take any corrective action.").

The Eleventh Circuit's opinion in *Breda v. Wolf Camera & Video*, 222 F.3d 886 (11th Cir. 2000), is particularly instructive regarding the employer's second requirement: to demonstrate that the employee failed to effectively take advantage of the policy. In *Breda*, the court stated:

> When an employer has a policy for reporting harassment that is clear and published to its employees, and an employee follows that policy, *the employer's notice of the harassment is established by the terms of the policy*. Through its policy, the employer has given the designated person explicit actual authority to handle the complaints. Whether the designated person has apparent authority is not relevant to the inquiry–his or her actual authority already has been established through the terms of the employer's policy.

> Consequently, if a company has a clear and published policy that outlines the procedures employees must follow in reporting cases of suspected harassment, courts determining whether employer liability has been established need not delve into the internal policies of the company to determine whether the person to whom the complaints of harassment were made had the apparent authority to respond to such complaints. Furthermore, employees of such companies who believe they are victims of harassment *need not be concerned with whether they pursued their complaints far enough up the company ladder*. The sole inquiry when the employer has a clear and published policy is whether the complaining employee followed the procedures established in the company's policy.

*Breda*, 222 F.3d at 889-90 (emphasis added); *see also Madray*, 208 F.3d at 1299-1300; *Coates*, 164 F.3d at 1364.

In this case, Dillard's argues that it has promulgated the type of anti-harassment policy specified in *Madray*. Further, with respect to Giacomin, it took proper corrective action by immediately firing Hines. (Doc. No. 51 at 20-21.) Reed, Dillard's contends, did not effectively follow its policy by continuing to complain up the chain of command. (*Id.* at 21-24.) Therefore, the company cannot be charged with notice of the incidents he alleges. (*Id.*)

These arguments lack support in both the record and the case law. As an initial matter, Dillard's fails to establish the first competent of the *Faragher* defense. The harassment policy cannot absolve Dillard's of liability if it was not effectively implemented. *Madray*, 208 F.3d at 1296-97. Even before the incidents involving Reed, Hines' conduct was the subject of a previous complaint.[12] (Doc. No. 69-10.) Other than cryptically declaring that it "could not substantiate" Sanabria's allegations, Dillard's has presented no evidence that it conducted an investigation or took any corrective action with respect to this complaint.[13] (*See* Doc. No. 68-19 at 1-2.) Further, Reed testified that he complained twice about Hines' conduct and was rebuffed by Coffey in each instance. (Reed Dep. at 205-06, 212-13.) These complaints to Coffey were made before the

---

[12]     The statements contained in Sanabria's complaint are ostensibly hearsay. *See* Fed. R. Evid. 801(c). Unless the EEOC identifies an applicable exception, these statements may not be used to prove whether Hines actually engaged in the alleged conduct. However, the complaint is admissible to the extent it is introduced to show that Dillard's had notice of a prior sexual harassment complaint regarding Hines. *Cooper-Schut v. Visteon Automotive Sys.*, 361 F.3d 421, 430 (7th Cir. 2005) (permitting hearsay evidence in a Title VII case to demonstrate notice of harassment, but not to prove the matter asserted); *see also United States v. Lee*, 427 F.3d 881, 896 (11th Cir. 2005) (permitting the introduction of a letter advising the defendant that a particular transaction was fraudulent for the purpose of showing that the defendant had notice that the transaction was illegal). Further, to the extent the complaint is being introduced to show notice, it does not constitute character evidence. Fed. R. Evid. 404(a)-(b).

[13]     Dillard's bears the burden of establishing that both prongs of the Faragher defense are satisfied. *Nurse "BE" v. Columbia Palms West Hosp. Ltd. P'ship*, 490 F.3d 1302, 1309 (11th Cir. 2007).

incident involving Hines and Giacomin. According to the company's harassment policy, Coffey had an unconditional responsibility to report the incidents that Reed alleged to the general counsel's office, regardless of whether Coffey believed the complaints had merit. (Doc. No. 54-5 at 6.) Dillard's also had a responsibility, under the terms of its own policy, to investigate Reed's allegations. (*Id.*) In sum, Dillard's has failed to demonstrate that it complied with the preventative measures laid out by its own harassment policy. Therefore, a jury could find that Dillard's failed to take preventative action with respect to both Reed and Giacomin.

Dillard's also fails to establish that no genuine issues of material fact exist regarding Reed's compliance with the sexual harassment policy. The harassment policy states that a complaining employee may contact "any one" of three specified offices or individuals at the employee's "discretion." To avoid this unambiguous language, Dillard's emphasizes that its open door policy encourages employees to voice unaddressed concerns to higher levels of management, and Reed himself testified that he thought the proper way to complain was to contact successively higher individuals along the chain of command until action is taken. (Doc. No. 51 at 22.) However, the Eleventh Circuit has expressly held that an employee is not required to do anything more than the harassment policy requires; if the policy instructs the employee to complain to a particular person, the employee need not complain to anyone else. Here Reed complained to Coffey, and Coffey held one of the three positions to which complaints were to be directed. *Breda*, 222 F.3d at 889-90. Thus, a jury could find that Reed complied with express terms of the harassment policy, even if Reed himself thought more was required. *Id.*

## II.     Constructive Discharge

The EEOC contends that Reed and Giacomin were constructively discharged by virtue of the hostile work environment at Dillard's.  In response, Dillard's argues that: (1) neither Reed nor Giacomin experienced conduct necessary to support a constructive discharge; and (2) both employees left Dillard's for reasons unrelated to Hines' behavior.  (Doc. No. 51 at 18-19.)

To establish a constructive discharge, a plaintiff must demonstrate "that the abusive working environment became so intolerable that [the employee's] resignation qualified as a fitting response." *Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004).  In the hostile work environment context, the harassment must be "ratcheted up to the breaking point." *Id.* at 134-36, 152 (finding that a genuine issue of material fact existed regarding the plaintiff's constructive discharge claim where a female police officer's supervisor made sexually offensive comments daily, falsely told her that she had failed multiple proficiency tests, and arrested her for theft after she took possession of the original copies of her test answers).  According to the Eleventh Circuit, "[t]o successfully claim constructive discharge, a plaintiff must demonstrate that working conditions were so intolerable that a reasonable person in his position would have been compelled to resign." *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001).  The threshold "is quite high." *Compare id.* (holding that being berated in public was not sufficient to show constructive discharge), *Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974, 977-78 (11th Cir. 2003) (holding that being reprimanded and hearing from coworkers of management's intent to fire were insufficient to show constructive discharge), *and Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir. 2001) (holding that receiving poor evaluations was not sufficient to establish constructive discharge), *with Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1015, 1021-22 (11th Cir. 1994) (holding that a court's finding

of constructive discharge was supported by evidence of the plaintiff being placed on probation, receiving unjustified work evaluations, and being repeatedly screamed at so that supervisor's "spit was flying in [the plaintiff's] face"), *and Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 552 (11th Cir. 1997) (holding that summary judgment for the defendants was inappropriate where the plaintiff was relieved of all responsibilities, was given a chair with no desk, and other employees were instructed not to speak to her).

Further, the employee must have actually left because of the harassment and not for an unrelated reason. *Taylor v. Roche,* 196 F. App'x 799, 803 (11th Cir. 2006) (upholding a district court's determination that a constructive discharge did not occur because, "as the district court observed, the real reason for Taylor's discharge/retirement was his 'extremely serious 20-year old injury' that Taylor admitted was causing him 'excruciating' pain"); *Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 906 (11th Cir. 1998) (upholding a district court's determination that a constructive discharge did not occur because "the resignation was due primarily" to a dispute with another employee concerning a matter unrelated to her employment); *Laughlin v. Pilot Travel Centers, LLC*, No. 5:05-cv-342-Oc-10GRJ, 2007 WL 121344, at * 4 (M.D. Fla. Jan. 11, 2007) (finding that a constructive discharge did not occur because, despite the existence of a hostile work environment, the plaintiff admitted to resigning because of back pain).

The conduct Reed described in his testimony was sufficiently severe to support a constructive discharge. Resignation is a fitting response after being sexually battered at work. A reasonable person in Reed's position would have resigned after this incident, especially given Reed's allegation that Coffey ignored both of Reed's previous complaints. Further, Reed's testimony indicates that he indeed resigned due to Hines' conduct. Reed testified that he quit

immediately after being attacked by Hines in the bathroom because he could not take anymore of Hines' behavior. (Reed Dep. at 198.) Dillard's ignores this testimony and instead attempts to convince the Court that Reed must have quit because Reed had recently received a final warning about unexcused absences, and he therefore would have been terminated if he missed another day of work. (Doc. No. 51 at 18-19.) Although a jury might choose to disbelieve Reed and infer that Reed quit because he was in danger of being terminated, the Court cannot make this type of factual determination at the summary judgment stage.[14]

Again, the issue of whether Giacomin was constructively discharged is closer because he experienced only one, though very serious, incident of harassment. As explained above, Giacomin testified that he feared retaliation from Hines' friends after the incident, and he also became uncomfortable and "paranoid" during the rest of his employment at Dillard's. (Giacomin Dep. at 115-17.) The Court has previously found that this claimed discomfort was reasonable at the time of the incident, given the severe conduct Giacomin experienced. *See supra*, section I.A. The

---

[14] Dillard's does not argue that Reed resigned without giving Dillard's an opportunity to correct the unfair treatment. *See Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996) (affirming summary judgment where the employer began an investigation of the plaintiffs' complaint on a Friday and attempted to meet with the plaintiffs on the following Tuesday, but the plaintiffs did not return to work after advising the employer of their complaints); *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987) ("Part of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast."); *see also Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 617 (8th Cir. 2000) ("An employee must, however, grant her employer a reasonable opportunity to correct the intolerable condition before she terminates her employment." (citation omitted)). Even if Dillard's did raise this issue in the three sentences it devotes to discussing how a reasonable employee should have reacted to Hines' conduct, (*see* Doc. No. 51 at 18), the Court would not be persuaded to grant summary judgment. Reed had already given Dillard's two opportunities to correct Hines' conduct, and by the time the third incident occurred, considering the evidence in the light most favorable to the non-movant Plaintiff, a reasonable employee in Reed's position would assume that Dillard's did not intend to address his complaints.

question now becomes whether it was reasonable for Giacomin to resign one month after this incident due to his discomfort.

Unfortunately, no other case has featured facts analogous to this case, and the parties have provided a combined two pages of analysis on the issue of constructive discharge. The Court's research indicates that the cases finding instances of a constructive discharge generally appear to feature long-term, pervasive harassment. *See Suders*, 542 U.S. at 134-36; *Meeks*, 15 F.3d at 1015, 1021-22; *Poole*, 129 F.3d at 552; *see also Hipp*, 252 F.3d at 1231-32 ("This circuit has required pervasive conduct by employers before finding that a hostile work environment existed or a constructive discharge occurred.") The Court is unaware of any case law finding a constructive discharge based on one event. In this case, Giacomin experienced only one incident that lasted several seconds. Such conduct, even if repugnant, does not constitute the type of pervasive harassment that makes "working conditions . . . so intolerable that a reasonable person . . . would . . . [be] compelled to resign." *Hipp*, 252 F.3d at 1231. Further, even if one incident alone was sufficient to cause a constructive discharge, Giacomin's experience would likely not qualify. Though it was sufficiently "severe" to alter the terms and conditions of Giacomin's employment at or near the time of the incident, *see supra*, section I.A, the conduct does not meet the even higher standard of a constructive discharge. *See Suders*, 542 U.S. at 147-48 (explaining that a constructive discharge is harassment "racheted up to the breaking point"); *Hipp*, 252 F.3d at 1231-32 (collecting cases).

More importantly, Giacomin continued working at Dillard's for over a month after the incident, and he testified that he never again saw Hines, who had been immediately fired after Giacomin's complaint, or experienced any other harassment. (Giacomin Dep. at 42, 107-08, 120-

21.)  When he eventually resigned, Giacomin indicated in his resignation paperwork that he was leaving "due to school." (*Id.* at 121-23.)  In *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1317 (11th Cir. 1989), the Eleventh Circuit concluded that a district court did not err in finding that employees were not constructively discharged where the harassment ceased before they resigned. Further, the Eleventh Circuit's conclusion that it is unreasonable for an employee to resign without giving an employer time to correct a complaint of discrimination, *e.g.*, *Garner*, 807 F.2d at 1539, also implies that it would be unreasonable for an employee to resign after the employer takes corrective action.  *See id.*; *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992) ("A reasonable employee would not have felt compelled to resign immediately following the institution of measures which the district court found to be reasonably calculated to stop the harassment."). Given this case law, it was unreasonable as a matter of law for Giacomin to resign an entire month after the event and after Dillard's had taken corrective action.[15]  Accordingly, Dillard's is entitled to summary judgment on the EEOC's claim relating to Giacomin's constructive discharge.

## III.    Punitive Damages

For the issue of punitive damages to reach a jury in a Title VII case, a plaintiff must come forward with substantial evidence that the employer acted with actual malice or reckless indifference to the plaintiff's federally protected rights.  *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535-39 (1999); *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1280 (11th Cir. 2002); 42 U.S.C. §

---

[15]    During his deposition, Giacomin stated that he left because he did not feel comfortable at Dillard's after the utility room incident. (*Id.* at 120-21.)  Thus, Giacomin's paperwork on resignation suggests that he left for reasons unrelated to Hines' conduct, while his testimony supports the opposite conclusion.  Even if this conflict in the evidence were sufficient to raise a genuine issue of material fact regarding Giacomin's actual reason for resigning, the resignation would still be objectively unreasonable for the reasons stated above.  *Hipp*, 252 F.3d at 1231.

1981a (2006). The ultimate question concerns the employer's "state of mind," specifically whether employer "discriminated in the face of a perceived risk that its actions will violate federal law . . . ." *Kolstad*, 527 U.S. at 536. This culpability may be proven through the evidence of "egregious misconduct," *id.* at 534, 546, or by evidence concerning the employer's state of mind, *see id.* at 535-39.

In practice, however, this standard can be difficult to apply. Many Title VII defendants are business organizations, and organizations cannot harbor malicious thoughts. Thus, the plaintiff "must impute liability for punitive damages" to the employer. *Id.* at 539-40. "Punitive damages will ordinarily not be assessed against employers with only constructive knowledge of the violations." *Dudley v. Wal-Mart Stores, Inc.*, 166 F.3d 1317, 1323 (11th Cir. 1999)) (internal quotation marks omitted). Rather, to receive punitive damages, a plaintiff "must show either that the discriminating employee was high up the corporate hierarchy, or that higher management countenanced or approved his behavior." *Id.* "In other words, the employer must be proved to be at fault." *Id.*

The EEOC relies on two facts in support of its request for punitive damages: (1) that Coffey rebuffed Reed's two complaints; and (2) that Dillard's did not take any corrective action after

Sanabria's complaint.[16]  (Doc. No. 53 at 19-20.)  However, neither fact is sufficient to bring the issue of punitive damages before a jury.

Coffey's alleged failure to report the harassment is not sufficient to support punitive damages because the EEOC has not presented evidence that Coffey was high enough in the corporate hierarchy for his actions to be imputed to the corporation.  *See Dudley*, 166 F.3d at 1323 (concluding that a store manager and co-manager who discriminated against the plaintiff were not high enough in the corporate hierarchy to support an award of punitive damages against a national retailer); *see also Miller*, 277 F.3d at 1280 (finding that an employer had constructive knowledge of discrimination sufficient to abrogate its *Faragher* defense, but it did not have actual notice necessary to award punitive damages).  Though neither party has presented a diagram of the Dillard's corporate structure, it appears Coffey was at the lowest of three levels of management: the store level management, the "district office" level regional management, and the corporate headquarters in Little Rock, Arkansas.  (*See* Doc. No. 54-5 at 6 (describing the three levels of management to which harassment complaints may be directed); Doc. No. 69-5 at 13-14 (describing the interaction between store managers, the district office, and the corporate headquarters for termination decisions).)  Under the Eleventh Circuit's case law, the actions of this lowest level of management cannot be imputed to the corporation for punitive damages purposes.  *Dudley*, 106 F.3d at 1323.

---

[16]      The EEOC also appears to fault Dillard's for failing to conduct a full investigation of Giacomin's complaint.  (Doc. No. 53 at 19 (arguing that Dillard's did not investigate "any" of the three complaints against Hines).)  However, the district office's decision to take Giacomin for his word and summarily fire Hines does not show an indifference to Title VII rights.  If anything, the failure to fully investigate Giacomin's complaint harmed Hines, the alleged harasser, who was summarily fired.  Further, the EEOC has not presented any legal authority requiring Dillard's to uncover additional victims of Hines' harassment who have not come forward on their own accord.

With regard to the second ground for punitive damages, the EEOC is presumably arguing that the Dillard's higher management, specifically the district office, countenanced or approved Hines' behavior by failing to take corrective action and by later allowing Coffey to give Hines a promotion. There appears to be no dispute that the Dillard's district office had actual notice of Sanabria's sexual harassment complaint against Hines.[17] (Doc. No. 68-18 (affidavit submitted by Dillard's explaining that the district office was aware of Sanabria's sexual harassment complaint).) The issue, then, is whether a reasonable juror could infer from management's conduct that Dillard's acted in the "face of a perceived risk that its actions [would] violate federal law." *Kolstad*, 527 U.S. at 536.

The cases finding conduct sufficient to support such an inference involve either repeated failures to investigate or some type of catalytic behavior by the employer's upper management. *See Chavez v. Thomas & Betts Corp.*, 396 F.3d 1088, 1099 (10th Cir. 2005) (upholding a jury's award of punitive damages where the defendant ignored its own sexual harassment policy by not acting on complaints regarding a particular harasser, the eventual investigation was belated, and the company never took action against the harasser), *overruled on other grounds as recognized in Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 n.2 (10th Cir. 2006); *Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 618-19 (8th Cir. 2000) (upholding a punitive damages award where the employer failed to investigate complaints and actually reassigned an employee to place her in closer

---

[17] Neither party briefs or presents evidence on the issue of whether the district office's actions can be imputed to Dillard's for punitive damages purposes. Nor does the case law contain any meaningful definition of "higher management." *See Wilbur v. Corr. Servs. Corp.*, 393 F.3d 1192, 1205 (11th Cir. 2004); *Miller*, 277 F.3d at 1280; *Dudley*, 166 F.3d at 1323. For purposes of this Order, the Court will assume without deciding that the district office constitutes part of Dillard's "higher management" because, even with this factual issue resolved in the EEOC's favor, punitive damages are still unavailable.

proximity to the harasser); *Timm v. Progressive Steal Treating, Inc.*, 137 F.3d 1008, 1009 (7th Cir. 1998) (upholding a punitive damages award where an employer had notice of prior instances of alleged sexual harassment by the harasser, took no action, and later justified its inaction by claiming that the employee failed to file a formal complaint, despite a company policy encouraging informal complaints); *Jonasson v Lutheran Child & Family Servs.*, 115 F.3d 436, 438-39 (7th Cir. 1997) (upholding award of punitive damages where an employer demonstrated "ostrich-like" behavior by ignoring repeated complaints about a harasser).

Unlike the above cases, the district office was aware of only one previous complaint about Hines. Further, there is no evidence that Dillard's enabled or encouraged Hines to harass employees. Unlike *Henderson*, the record does not indicate that Hines' promotion increased the risk that Hines would sexually harass other employees. *C.f.*, *Henderson*, 217 F.3d at 618-19 (management placed the harasser in closer proximity to a complainant). Moreover, Dillard's immediately fired Hines after receiving notice of the more serious conduct directed toward Giacomin, (*see* Doc. Nos. 69-3 to -4), suggesting that the company's higher management did not actually approve of Hines' behavior.

In effect, the only evidence the EEOC presents in support of punitive damages is a lack of evidence: there is no indication in the record how Dillard's handled Sanabria's complaint. Unlike the *Faragher* defense, however, the burden to justify punitive damages rests with the plaintiff. Thus, the EEOC must come forward with substantial evidence of malice or reckless indifference to survive summary judgment on its punitive damages claim. *Kolstad*, 527 U.S. at 536-57; *Miller*, 277 F.3d at 1280. Given the very high level of culpability required to authorize punitive damages, it does not appear that a reasonable juror could infer "reckless disregard" or "actual malice" from an employer's

failure to explain how it handled one previous sexual harassment complaint. Accordingly, summary judgment must be granted in favor of Dillard's on this issue.

## Conclusion

The Motion by Dillard's, Inc. for Summary Judgment (Doc. No. 50, filed Oct. 3, 2008) is **GRANTED in part** and **DENIED in part**. The Motion is **GRANTED** to the extent Defendant seeks summary judgment on: (1) the constructive discharge claim related to Giacomin's resignation; and (2) Plaintiff's entitlement to punitive damages. The Motion is **DENIED** in all other respects. The Motion by Dillard's, Inc. to File a Reply in Support of its Motion for Summary Judgment (Doc. No. 56, filed Nov. 7, 2008) is **DENIED as moot**.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on March 23, 2009.

PATRICIA C. FAWSETT, JUDGE
UNITED STATES DISTRICT COURT